UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| VERNON SWOFFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:14-CV-47 (CEJ) |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.     Procedural History

In June 2011, plaintiff Vernon Swofford filed applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income benefits, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of May 5, 2011 (Tr. 110-26).   After plaintiff's applications were denied on initial consideration (Tr. 47-51, 64-68), he requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 54-55).  Plaintiff and counsel appeared for a video hearing on November 27, 2012.  (Tr. 25-43).  The ALJ issued a decision denying plaintiff's applications on December 3, 2012.  (Tr. 9-24).   The Appeals Council denied plaintiff's request for review on February 10, 2014.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.     Evidence Before the ALJ

### A.   Disability Application Documents

In his Disability Report filed on June 17, 2011 (Tr. 158-65), plaintiff listed his disabling conditions as breathing problems, arthritis, and back pain. He stopped working on May 5, 2011, because of these conditions. (Tr. 159). From 1973 to 1976, plaintiff attended special education classes. (Tr. 160). Plaintiff worked as a saw operator at a saw mill from 1994 to 2002, and then as a lumber stacker at a saw mill from 2002 to May 5, 2011. Both jobs involved standing for 8 hours a day and consistent routines. (Tr. 178-79, 188). He took prescription medicines for his cholesterol, blood pressure, diabetes, pain, and breathing problems. (Tr. 162).

Plaintiff completed a Function Report on June 23, 2011. (Tr. 166-176). Plaintiff's friend Judy McClurg helped him complete the report, since he was not able to concentrate or write well. (Tr. 176). In the report, plaintiff stated that his daily activities consisted of fixing meals, taking medicines, feeding his dogs, resting, watching television, going for a walk, checking mail, taking breathing treatments every four hours, and checking his blood sugar twice a day. (Tr. 166). Since the onset of his medical conditions, plaintiff stated he could only mow the yard for a short period of time, no longer enjoyed fishing or other outdoor activities due to his difficulties breathing, and had to sleep sitting in a chair. (Tr. 167-70). He was able to groom himself and enjoy his hobbies and social activities as long as he remained near accessible air conditioning and did not become overheated. Plaintiff was capable of walking, driving a car, and riding in a car. (Tr. 169). He could walk only 20 yards before needing a 10-15 minute rest, and he used a cane for walking. (Tr. 171-72). His arthritis affected his ability to lift, squat, bend, reach and walk. Plaintiff stated that he got along "pretty well" with authority figures and had never been fired or laid off from a job because of problems getting along with

others.  (Tr. 172).  He cited having an unusual fear of dying since the onset of his illnesses and breathing problems.

In his Disability Report filed for his appeal dated November 29, 2011 (Tr. 211-16), plaintiff reported a worsening of his medical condition since his last disability report.  He stated, "I can't do my daily activities outside or inside.  It is hard for me to breathe when I do anything."  (Tr. 215).

## B.  Testimony at the Hearing

Plaintiff was 53 years old on the date of the hearing.  (Tr. 29).  His highest level of education was the tenth grade, and he did not have a GED.  Plaintiff testified that he had served in the National Guard.  (Tr. 30).  He was married and lived with his wife, Sandra.  (Tr. 30, 35).  Plaintiff stated that he had a driver's license, but his legs ached when he drove.  He had quit smoking three years prior. He quit working in May 2011 after he began having trouble breathing.  (Tr. 31). Walking, standing, and high temperatures exacerbated his difficulties breathing. (Tr. 31-32).  He could only stand for five minutes before he needed to sit down.

Plaintiff also stated that he had numbness and tingling in his hands on a daily basis, which sometimes caused him to drop things.  (Tr. 33).  Additionally, he had back pain that he treated with ibuprofen.  Plaintiff's wife did all of the housework and chores without his assistance.  (Tr. 34).  Plaintiff's neighbor did his yard work. (Tr. 35).  For fifteen years plaintiff worked in saw mills and at a stacking stage. (Tr. 35-36).  With respect to his mental condition, plaintiff testified that he became nervous around other people, he had a difficult time controlling his temper, and he felt sad every other day.  (Tr. 34).

Dan R. Zumalt, a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education, and work experience. (Tr. 36-42). Mr. Zumalt first noted that plaintiff's past work as a saw mill worker was semi-skilled and was performed at a light exertional level, while his work as a head saw operator was skilled and was performed at a medium exertional level. (Tr. 37). The ALJ asked the vocational expert whether a hypothetical individual with plaintiff's background who retained the capacity to occasionally lift 20 pounds and who should avoid prolonged exposure to temperature extremes and humidity could perform plaintiff's past work. Mr. Zumalt responded that such an individual would be precluded from plaintiff's past employment based on the environmental conditions present at those work sites. (Tr. 38-39). The ALJ asked Mr. Zumalt if he could identify other jobs locally and nationally in the economy this hypothetical person perform. The vocational expert testified that the ALJ's hypothetical would allow a reduced range of light employment, such as bench assembly, collator operator, and subassembly. (Tr. 39-40).

In response to questions from plaintiff's attorney, the vocational expert noted that the first hypothetical individual would be unable to perform the jobs cited if the individual was limited to occasional handling bilaterally, if the individual would be absent for two days per month, or if the individual would be off-task for up to 20 percent of the day. (Tr. 41).

The ALJ proposed a second hypothetical individual with the same age, educational background, and work history of plaintiff who could lift no more than five pounds occasionally, could not climb, stoop, crouch or crawl, could occasionally push and pull, could occasionally handle but never reach, and with other

characteristics incompletely recorded in the transcript. (Tr. 40). The vocational expert testified that plaintiff's prior work was precluded, and no other competitive work was available for such an individual.

### C. **Medical Records**

The medical records show that plaintiff visited the Good Samaritan Care Clinic on eight occasions from June 2010 through November 2010, seeking prescription refills and to have lab work completed. (Tr. 332-50). He had prescriptions for Crestor,[1] Lisinopril,[2] Metformin,[3] and Naproxen.[4] On November 2, 2010, lab results at St. Francis Hospital indicated that his glucose levels were near normal and the care provider noted, "very good! . . . contained with regular meds." (Tr. 350). On December 13, 2010, plaintiff went to the clinic complaining of a cough and a fever and stating that he had had a chronic cough for 6 months to one year. (Tr. 330-31). He was prescribed an Albuterol[5] inhaler and instructed to use two puffs every six hours as needed. Plaintiff was treated at the Shannon County Medical Clinic for diarrhea and vomiting with the associated symptoms of dizziness and weakness on January 25, 2011. (Tr. 361-62). He was diagnosed with gastroenteritis and was told to increase his fluids Medication was prescribed.

On March 12, 2011, plaintiff sought medical treatment in the emergency department at Mercy St. John's Hospital for shortness of breath exacerbated by

---

[1] Crestor, a brand name for Rosuvastatin, is used to reduce the risk of heart attack and stroke for persons who have heart disease or at risk of developing heart disease. Rosuvastatin is also used to decrease the amount of cholesterol and triglycerides in the blood.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603033.html (last visited April 30, 2015).
[2] Lisinopril is indicated for the treatment of hypertension. See Phys. Desk Ref. 2053 (61st ed. 2007).
[3] Metformin is an oral medication for the treatment of Type 2 diabetes.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html (last visited May 17, 2010).
[4] Naproxen is the generic name for Naprosyn, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. See Phys. Desk Ref. 2769-70 (60th ed. 2006).
[5] Albuterol is an aerosol inhalant prescribed for treatment of bronchospasm. See Phys. Desk Ref. 3067 (60th ed. 2006).

exertion. (Tr. 260-78). He had a minimal cough and no fever, and he was light-headed, sweating, in mild respiratory distress, and anxious. He reported a past history of high blood pressure, diabetes mellitus, high cholesterol, acute bronchitis, and arthritis. During the fall risk assessment, plaintiff did not report using a cane or walker. A chest x-ray did not detect any abnormality or infiltrates. After bronchodilator[6] treatment with a nebulizer,[7] plaintiff improved and he was discharged. Oren Broughton, M.D. diagnosed plaintiff with acute bronchitis, bronchospasm,[8] and acute dyspnea.[9] Dr. Broughton prescribed plaintiff Zithromax,[10] an Albuterol inhaler, and Prednisone.[11] Plaintiff was instructed to engage in only light activity for a week.

On March 19, 2011, plaintiff returned to the emergency room with shortness of breath that had started that morning. (Tr. 279-95). He also had wheezing with a productive cough, numbness in his hands, a flushed face, and appeared anxious. He was provided an IV and cardiac monitor. Test results showed that his complete blood count was normal. Additionally, his chest x-ray was normal with no infiltrates. Jerald Chaffin, M.D. diagnosed plaintiff with acute dyspnea, bronchospasm, and anxiety. He discharged plaintiff with prescription refills.

---

[6] Bronchodilators are medications that relax the muscles around a person's airways.
http://www.nhlbi.nih.gov/health/health-topics/topics/copd/treatment (last visited April 30, 2015).
[7] Nebulizers are used to treat asthma, chronic obstructive pulmonary disease, and other conditions by delivering a stream of medicated air to the lungs over a period of time.
http://www.nlm.nih.gov/medlineplus/ency/presentations/100201_1.htm (last visited April 30, 2015).
[8] Bronchospasm is difficulty breathing.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a600014.html (last visited April 30, 2015).
[9] Dyspnea is also known as shortness of breath.
http://circ.ahajournals.org/content/129/15/e447.full.pdf (last visited April 30, 2015).
[10] Zithromax, the brand name for Azithromycin, is used to treat bacterial infections, such as bronchitis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697037.html (last visited April 30, 2015).
[11] For patients with normal corticosteroid levels, Prednisone can be used to treat arthritis.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html (last visited April 30, 2015).

Medical notes from Shannon County Medical Clinic on March 21, 2011 noted that plaintiff had shortness of breath and resolving bronchitis. (Tr. 360).

Plaintiff returned to the emergency room on April 10, 2011 with shortness of breath, weakness, and a shaky hand that had started 30 minutes before his admittance. (Tr. 296-309). Plaintiff had been playing cards with his wife and another couple when his symptoms occurred. Medical providers noted that plaintiff had used his Albuterol inhaler, which may have helped his dyspnea but worsened his hand shaking. He reported generalized weakness, trouble breathing, nausea, dizziness, and lost power in his right arm. He appeared to be in mild distress and anxious. Dr. Broughton prescribed Xanax,[12] Xopenex,[13] Decadron aerosol,[14] and Compazine.[15] The doctor recommended plaintiff to seek a referral for a neurologist from his primary care physician, Joseph V. Bruce, M.D. to assess his shaking. Plaintiff did report using a walker, cane or wheelchair.

On April 13, 2011, plaintiff was treated at Shannon County Medical Clinic for complaints of his right arm shaking and shortness of breath. (Tr. 356-57). He reported that his symptoms had begun three days earlier. He reported fatigue, but denied pain. A medical care provider noted, "panic attacks?" (Tr. 356). He was diagnosed with bronchitis and tremor in his right arm.

---

[12] Xanax is indicated for the treatment of panic disorder. See Phys. Desk Ref. 2655-56 (60th ed. 2006).

[13] Xopenex, the brand name for Levalbuterol, is used to prevent or relieve wheezing, shortness of breath, coughing, and chest tightness caused by lung disease such as asthma and chronic obstructive pulmonary disease. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603025.html (last visited April 30, 2015).

[14] Decadron, the brand name for Dexamethasone, is a corticosteroid that relieves inflammation and is used to treat certain forms of arthritis.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682792.html (last visited April 30, 2015).

[15] Prochlorperazine, also known as Compazine, is used to control severe nausea and vomiting and to treat the symptoms of schizophrenia and anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682116.html (last visited on Sept. 1, 2011).

Plaintiff was admitted to the emergency room at Ozarks Medical Center on May 8, 2011 with complaints of shortness of breath that had started a month prior. (Tr. 229-44). He had a cough, wheezing, chills, numbness, and tingling. His cough produced green and white sputum. Use of an inhaler helped his wheezing. Plaintiff did not have a fever, chest pain or discomfort, foot swelling, or dizziness. He reported taking a breathing treatment twice a day. His EGK was normal, but his chest x-ray showed infiltrate in the left lower lobe. He also had a mild elevation in his white blood count. Jeremy Reed, M.D. diagnosed plaintiff with pneumonia and prescribed six days' use of Levaquin.[16] Dr. Reed also suggested a CT scan of plaintiff's lungs the next morning as an outpatient. At the end of the visit, plaintiff reported that the difficulty breathing was gone, and he was discharged.

Three days later, on May 11, 2011, plaintiff sought treatment at the Shannon County Medical Clinic for pneumonia. (Tr. 354-55). Plaintiff's wife related that Dr. Reed had suggested a CT scan, which medical providers scheduled for the next day since plaintiff remained symptomatic. Plaintiff was assessed to have left lobe pneumonia. He refused cough medicine and admission to the hospital, but said he would agree to be admitted the next day if he did not improve. Plaintiff was instructed to continue use of Levaquin and Albuterol.

That evening, plaintiff went to the emergency room at the Ozarks Medical Center by ambulance for constant shortness of breath. (Tr. 245-53). He described his dyspnea as moderate, worsened by exertion and cough, improved by rest. Plaintiff had a cough productive of moderate amounts of white sputum. He did not have sweating episodes, chest pain, calf pain, or foot swelling. He reported muscle

---

[16] Levaquin is a fluoroquinalone antibacterial indicated for treatment of adults with infections caused by designated, susceptible bacteria. Phys. Desk Ref. 2629 (64th ed. 2010).

aches, nausea, fatigue, and dizziness.  On physical examination, Kathryn Egly, M.D. found that plaintiff's respiratory system had moderately decreased air movement diffusely over both lungs.  He also had mild bilateral wheezes diffusely and dullness on percussion.  His EKG was normal.  A chest x-ray showed infiltrate in the right middle lobe and left lingual, consistent with pneumonia.  Because outpatient treatment for the pneumonia had failed, plaintiff was admitted to the hospital for two days and treated with IV antibiotics, Rocephin[17] and Zithromax.  Lab tests were ordered.  Dr. Egly diagnosed bacterial pneumonia.

The next day at the Ozarks Medical Center, plaintiff noted feeling short of breath chronically, but stated that it had probably worsened over the last few weeks.  (Tr. 254-55).  He had a cough productive of yellow sputum.  Daniel R. Scheurich, M.D. noted that plaintiff's chest x-ray was fairly clear and did not look much worse than when he was diagnosed with pneumonia.  Dr. Scheurich determined that plaintiff would likely respond quickly to a short course of IV antibiotics and then could be discharged safely home on oral antibiotics.

Plaintiff was discharged from the Ozarks Medical Center in stable condition on May 13, 2011.  (Tr. 256-57).  Upon discharge, a chest x-ray was read as clear without infiltrate.  Dr. Scheurich noted that plaintiff's admittance to the hospital was "likely an exacerbation of undiagnosed chronic obstructive pulmonary disease." (Tr. 257).  Dr. Scheurich also noted that plaintiff "may have had some community acquired pneumonia on top of that."  Plaintiff was set up for a pulmonary function test in six weeks for diagnosis of chronic obstructive pulmonary disease (COPD) along with a follow-up with his primary care physician, Dr. Bruce, in two weeks.

---

[17] Rocephin, the brand name for a Ceftriaxone injection, is an antibiotic used to treat infections of the lungs, ears, skin, urinary tract, blood, bones, joints, and abdomen.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a685032.html (last visited April 30, 2015).

Medications provided to plaintiff included Azithromycin for seven days and Albuterol nebulizer every four hours as needed.

On May 20, 2011, plaintiff returned to the Shannon County Medical Clinic for a check-up, and reported feeling better. (Tr. 352-53). After examination, plaintiff was assessed to have resolving pneumonia and bronchitis. He was instructed to continue taking previously prescribed medications as directed. The medical provider also noted that plaintiff had been using his wife's oxygen mask, which he was instructed to discontinue. At the Good Samaritan Care Clinic on June 6, 2011, plaintiff reported being sick for 2-3 months and still not breathing normally. (Tr. 324). He noted that he slept sitting up, had a productive cough, and had shortness of breath "all the time." Dr. Van Bibber suspected COPD and told him he needed a pulmonary function test.

Plaintiff visited Mercy St. John's Hospital on June 8, 2011 to have a pulmonary function test diagnose his shortness of breath. (Tr. 310-19). Medical notes from that visit indicate that plaintiff had smoked 2.5 packs of cigarettes a day for 15 years but quit two years ago. Medical providers at the Good Samaritan Care Clinic inquired about the results of plaintiff's pulmonary function test on June 20, 2011, and also provided plaintiff Lipitor.[18] (Tr. 320-21). The test results were faxed to Dr. Van Bibber and Dr. Spoon the next day. (Tr. 346-48). The diagnosis was shortness of breath-COPD.

Plaintiff went to the emergency department at the Ozarks Medical Center on June 29, 2011 for shortness of breath. (Tr. 398-400). The doctor noted, "As it turns out, [plaintiff] is here visiting his brother who is in room 5. So he made

---

[18] **Error! Main Document Only.**Lipitor is used for the treatment of high cholesterol. See Phys. Desk Ref. 2495-96 (60th ed. 2006).

himself a patient." (Tr. 398). Plaintiff's condition was moderate and exacerbated by exertion. He had a productive cough and was light-headed. Plaintiff was diagnosed with COPD – acute exacerbation. A diagnostic imaging report showed his heart size to be normal with normal pulmonary vascularity. His lungs were free of significant parenchymal opacity, and the costophrenic angels were sharp. On the diagnostic imaging report, Charles R. Armonstrong, M.D. noted "[n]o acute findings of the chest." (Tr. 400).

On August 9, 2011, plaintiff returned to the emergency room at Mercy Hospital, arriving by ambulance. (Tr. 368-84). His shortness of breath/COPD was worse and had started one hour prior. There was a power outage at his house, so there was no operating air conditioning. His condition was exacerbated by exertion, lying flat, and coughing. He was wheezing, had a productive cough, and had anxiety. Plaintiff appeared to be in mild distress, obese, and well-hydrated. He had a lab work done, EKG monitor strips, and chest x-ray taken. The CT chest scan showed prominent arthritic change at the first costochondral junction, no acute pulmonary infiltrates or effusions, no pulmonary nodules or masses identified, and cholelithiasis (gallstones).[19] Plaintiff was diagnosed with acute dyspnea, acute exacerbation COPD, and gallstones. He was prescribed Prednisone and then dismissed. He did not use a cane, walker, or wheelchair. Plaintiff was given further aftercare instructions for acute bronchitis.

Plaintiff sought treatment at the Good Samaritan Care Clinic on August 29, 2011. (Tr. 451-54). It was noted that the clinic would see if it could get Advair

---

[19] **Error! Main Document Only.**See Stedman's Med. Dict. 339 (27th ed. 2000).

Diskus[20] samples for plaintiff. He was told to return in two weeks for the results of his lab tests. Plaintiff saw Jon Roberts, D.O. at the clinic on September 12, 2011. (Tr. 448-50). Dr. Roberts diagnosed plaintiff with COPD and hyptertension. Plaintiff was told to continue with present medication and return in two months. He was provided prescriptions for Albuterol, Metformin, Crestor, and Lisinopril.

On September 22, 2011, Robert Hughes, M.D. completed a Physical Residual Functional Capacity assessment for plaintiff as a medical consultant. (Tr. 385-90). Dr. Hughes first noted that plaintiff was diagnosed with COPD and diabetes, and also alleged obesity as an impairment. Dr. Hughes opined that plaintiff could occasionally lift or carry a maximum of 20 pounds, and frequently lift or carry a maximum of 10 pounds. Plaintiff could stand or walk with normal breaks for a total of about 6 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday. Plaintiff could push or pull without limits to his upper or lower extremities. Dr. Hughes further opined that plaintiff could frequently climb, stoop, kneel, crouch, and crawl, but could never balance. With respect to environmental limitations, plaintiff could tolerate extreme heat, wetness, humidity, noise and vibration, but should avoid concentrated exposure to extreme cold.

At the Good Samaritan Care Clinic on October 10, 2011, plaintiff sought medication refills and he was given prescriptions for Crestor and Prozac.[21] On October 31, 2011 he was given prescriptions for Pravastatin[22] and Albuterol. On January 2, 2012 plaintiff had a lipid profile and basic metabolic panel at the clinic.

---

[20] **Error! Main Document Only.**Advair is indicated for maintenance treatment of asthma and airflow obstruction in patients with COPD. See Phys. Desk Ref. 1275 (64th ed. 2010).

[21] **Error! Main Document Only.**Prozac, or Fluoxetine, is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder. See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

[22] Pravastatin is used to reduce the risk of heart attack and stroke for persons who have heart disease or at risk of developing heart disease. Pravastatin is also used to decrease the amount of cholesterol and triglycerides in the blood. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692025.html (last visited May 1, 2015).

(Tr. 435-38).    Plaintiff had not filled his prescription for Pravastatin and he asked for a refill on his blood pressure medication, which he had run out of three weeks prior.  Plaintiff reported having a pain on his right side when reaching behind and sleeping sitting up at night.   Dr. Roberts ordered a chest x-ray.   Results of the chest x-ray found no evidence of acute cardiopulmonary disease.  (Tr. 434).

On February 20, 2012, plaintiff received medical care at the Good Samaritan Care Clinic.  (Tr. 430-33).  Plaintiff reported wheezing the previous evening, and was given a prescription for ibuprofen.  Barry D. Spoon, D.O. diagnosed plaintiff with COPD/bronchitis on March 12, 2012 and prescribed Prednisone.  (Tr. 426-29). Plaintiff returned to the clinic on April 9, 2012 with shortness of breath while speaking.  (Tr. 432-25).  David Dale, D.O. diagnosed plaintiff with severe COPD, diabetes, and diabetic neuropathy.   Plaintiff was instructed to use his Albuterol inhaler as directed and was provided prescriptions for Lisinopril and Lovastatin. Plaintiff received an Advair Diskus prescription from Dr. Roberts on April 10, 2012. (Tr. 421).  Plaintiff began seeing Dr. Dale as a new patient at Dale Family Medicine on May 2, 2012.  (Tr. 403).  At that visit, plaintiff was reported to have loud and deep wheezing in his lungs and was obese.  He denied a cough or sore throat.  Dr. Dale diagnosed plaintiff with severe COPD, major depressive disorder, diabetes, and neuropathy.  The doctor prescribed Fluoxetine.[21]

On May 2, 2012, David Dale, D.O. completed a physical Medical Source Statement for plaintiff based on plaintiff's medical history, clinical findings, laboratory findings, diagnosis, treatment and prognosis.  (Tr. 392-93).  Dr. Dale found that plaintiff could lift or carry less than 5 pounds on an occasional basis. Plaintiff could stand or walk continuously for fifteen minutes, and throughout an 8-

hour day with usual breaks for two hours. Plaintiff could sit continuously for 30 minutes, and throughout an 8-hour day with breaks for two hours. Dr. Dale noted that plaintiff was limited in his ability to push or pull, because he could not perform repetitive action.

Dr. Dale also opined that plaintiff could never climb, stoop, kneel, crouch, crawl, or reach. He occasionally could balance, handle, and finger. He frequently could feel, see, speak and listen. With respect to environmental factors, Dr. Dale noted that plaintiff should avoid any exposure to extreme cold or heat, wetness or humidity, dusts or fumes, hazards, and heights. He should avoid moderate exposure to weather and vibration. When plaintiff suffered from pain, he needed to lie down for 20 minutes to alleviate symptoms. Plaintiff's pain did not cause a decrease in his concentration, persistence, or pace.

Dr. Dale also completed a mental Medical Source Statement for plaintiff. (Tr. 395-96). He opined that plaintiff had moderately limited ability to remember locations and work-like procedures and to understand and remember detailed instructions. Plaintiff also had moderately limited ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Plaintiff was markedly limited in his ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

Dr. Dale also found that plaintiff was moderately limited in his ability to interact appropriately with the general public and to get along with coworkers or

peers without distracting them or exhibiting behavioral extremes. He was moderately limited in his ability to respond appropriate to changes in the work setting, also. Lastly, Dr. Dale found that plaintiff was markedly limited in his ability to be aware of normal hazards and take appropriate precautions.

Plaintiff had no new complaints during his visit to Dale Family Medicine on June 1, 2012. (Tr. 402). He denied a cough, sputum, or a sore throat. Upon physical examination, Dr. Dale noted that plaintiff's breathing was audible at rest and the wheezing in his lungs was raspy and loud. Plaintiff was assessed to have severe COPD, hypertension, acute coronary artery disease, anxiety, depression, and diabetes. At a follow-up appointment to see Dr. Dale for a disability evaluation on July 30, 2012, plaintiff was assessed as having severe COPD, hypertension, hyperlipidemia, diabetes, major depressive disorder, and degenerative joint disease. (Tr. 412-13). His glucose levels were high. Dr. Dale prescribed Lisinopril.

On August 22, 2012, plaintiff had a screening examination at the Respiratory Therapy Services Department of Mercy Hospital. (Tr. 457-64). He reported shortness of breath after any exertion, but did not have a cough. Notes from the screening indicate that plaintiff had smoked 2.5 packs of cigarettes a day for 34 years, and quit 3 years prior. He was diagnosed with chronic airway obstruction and provided four puffs of a metered dose inhaler with Albuterol. Dr. Dale saw plaintiff at Dale Family Medicine for a four-month follow-up on November 5, 2012. (Tr. 466). Plaintiff had no new complaints, but still had low back pain. Dr. Dale diagnosed plaintiff with severe COPD, hypertension and hyperlipidemia, and noted that plaintiff would go to the free clinic next month.

### III. The ALJ's Decision

In the decision issued on December 3, 2012, the ALJ made the following findings:

1.      Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2014.

2.      Plaintiff has not engaged in substantial gainful activity since May 5, 2011, the alleged onset date.

3.      Plaintiff has the following severe impairments:  history of pneumonia/chronic obstructive pulmonary disease (COPD), obesity, and diabetes.

4.      Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.      Plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b).  Plaintiff can lift and carry 20 pounds occasionally and 10 pounds frequently. He is able to walk and stand for 6 hours in an 8-hour day and can sit for up to 6 hours in an 8-hour day.  Plaintiff must avoid prolonged exposure to temperature extremes, chemicals, dust, fumes/noxious odors, humidity and wetness.

6.      Plaintiff is unable to perform any past relevant work.

7.      Plaintiff was born on August 13, 1959 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.

8.      Plaintiff has a limited education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

10.     Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Social Security Act, since May 5, 2011, through the date of this decision.

(Tr. 9-24).

# IV. **Legal Standard**

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at

942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

Prior to step four, the ALJ must assess the claimant=s residual functioning capacity (>RFC=), which is the most a claimant can do despite her limitations.@ Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that

these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that that the ALJ failed to properly consider his mental impairments at step two, specifically by failing to conduct an appropriate psychiatric review technique analysis. Furthermore, plaintiff argues the ALJ erred in assessing

plaintiff's RFC, because the ALJ relied on a state agency opinion over the opinion of a treating physician and the substantial evidence of the record does not support the RFC limitations found by the ALJ.

## A. Plaintiff's Non-Severe Impairments

At step two of the five-step evaluation process for determining if an individual is disabled, the ALJ looks to see "whether the claimant has a severe impairment that significant limits the claimant's physical or mental ability to perform basic work activities." Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007); see 20 C.F.R. §§ 404.1520(c), 404.1521(a). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. Id.; see also Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

The ALJ determined that plaintiff had severe impairments consisting of a history of pneumonia/COPD, obesity, and diabetes. (Tr. 14). The ALJ noted that Dr. Dale had mentioned that plaintiff had neuropathy in his notes, but there was no documentation in the file, such as an EMG, NVC testing, or a monofilament test,

regarding neuropathy. As such, the ALJ found the neuropathy to be a non-medically determined impairment. The ALJ also considered plaintiff's allegations of suffering from anxiety and depression. (Tr. 15). The ALJ noted that Dr. Dale prescribed plaintiff Fluoxetine, but Dr. Dale's treatment notes did not contain any diagnosis of depression or anxiety, nor did they document any complaints or observations of symptoms associated with depression or anxiety. No mention of these diagnoses was found elsewhere in the record. As such, the ALJ found that plaintiff's depression and anxiety were "non-severe at best." Id. The ALJ found that plaintiff had no limitations in the functional areas or activities of daily living, social functioning, or maintaining concentration, persistence and pace with respect to the "B" criteria. The ALJ also found no indication of the any of the elements of the "C" criteria.

Plaintiff first argues that the ALJ erroneously found that his anxiety and depression were non-severe. However, while Dr. Dale prescribed plaintiff an anti-depressant and plaintiff mentioned having anxiety and depression at the hearing, plaintiff did not allege anxiety or depression in his applications for benefits (Tr. 159), and the record does not contain any evidence of plaintiff seeking treatment or therapy from a mental health professional. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) ("The fact that [plaintiff] did not allege depression in her application for disability benefits is significant, even if the evidence of depression was later developed."); Kirby, 500 F.3d at 709 (affirming the ALJ's conclusion that plaintiff's mental impairments were slight when plaintiff had "never had any formal treatment by a psychiatrist, psychologist, or other mental health professional over

any long-term basis" and "displayed no obvious signs of depression, anxiety, memory loss, or other mental disturbance" at the hearing).

The medical record as a whole indicates only occasional and minimal symptoms of anxiety and depression and focuses largely on plaintiff's physical conditions. See Partee v. Astrue, 638 F.3d 860, 864 (8th Cir. 2011) ("Some of the factors an ALJ may consider when determining a claimant's mental impairments are (1) the claimant's failure to allege mental impairments in his complaint, (2) failure to seek mental treatment, (3) the claimant's own statements, and (4) lack of medical evidence indicating mental impairment."). As such, the medical evidence supports the ALJ's finding of only insignificant limitations on plaintiff's mental ability to perform basic work activities.

Plaintiff also argues that the ALJ erred in failing to conduct a proper psychiatric review technique. When a plaintiff alleges a mental impairment, the ALJ is required to conduct a psychiatric review technique analysis. 20 C.F.R. § 416.920a(a)-(e). While the psychiatric review technique must be documented by completion of a standard form during the application process, it is permissible for an ALJ to conduct this analysis within the written decision such that the use of a written form is not required. Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007). Instead, "[i]n determining whether a claimant's mental impairments are 'severe,' the regulations require the ALJ to consider 'four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitation: [a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.'" Buckner, 646 F.3d at 556-57 (quoting 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3)). If the ALJ rates the degree of a plaintiff's

limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, the ALJ "will generally conclude that [plaintiff's] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [plaintiff's] ability to do basic work activities." 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

The ALJ considered these four broad functional areas, concluding that plaintiff had no limitations in the first three functional areas, and also found no indication in the record of episodes of decompensation. (Tr. 15). Also, as set forth above, medical evidence in the record as a whole did not indicate more than a minimal limitation in plaintiff's ability to do basic work activities. Thus, substantial evidence on the record as a whole supported the ALJ's determination that plaintiff's mental impairments, specifically depression and anxiety, were not severe.

**B.   The  RFC Determination**

Plaintiff also claims that the ALJ's RFC finding is not supported by substantial evidence, because the ALJ erred in assessing the opinion evidence proffered. "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted). Even though the RFC assessment draws from medical sources for support, however, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

After concluding that plaintiff had the severe impairments of a history of pneumonia, COPD, and diabetes, the ALJ found that plaintiff retained the residual

functional capacity to perform light work.  Specifically, the ALJ found that plaintiff can lift and carry 20 pounds occasionally and 10 pounds frequently; walk and stand for 6 hours in an 8-hour day and sit for up to 6 hours in an 8-hour day; and must avoid prolonged exposure to temperature extremes, chemicals, dust, fumes/noxious odors, humidity and wetness.  (Tr. 15).  In making this finding, the ALJ weighed all relevant evidence, including plaintiff's obesity, breathing problems, other cited physical and mental conditions as supported by objective medical records, daily activities, and opinion evidence provided by consulting and treating physicians.  (Tr. 15-18).  In assessing the proffered opinion evidence, the ALJ afforded the state agency medical consultant's opinion significant weight while affording the opinion of treating physician, Dr. Dale, minimal weight.  (Tr. 17).

The ALJ noted that the state agency medical consultant, Dr. Hughes, rendered the opinion after a review of the entire medical record and was familiar with the evidentiary standards used by the Social Security Administration.  (Tr. 17).  Dr. Hughes opined that plaintiff was capable of performing light work despite his health impairments.  Because Dr. Hughes' opinion was consistent with plaintiff's near normal pulmonary function test findings and chest x-rays, the ALJ afforded his opinion significant weight.

In contrast, treating physician Dr. Dale indicated that plaintiff was restricted to sedentary work.  However, the ALJ found that Dr. Dale's opinion as to plaintiff's physical condition was not supported by the medical evidence in the record, including pulmonary function testing and chest x-rays.  Specifically, the ALJ found no indication that Dr. Dale had performed objective function tests for any of plaintiff's alleged conditions, and his treatment notes were brief and did not

document any functional limitations.  The ALJ further found that Dr. Dale's opinion as to plaintiff's mental condition was inconsistent with evidence of plaintiff's work history.  The ALJ noted that Dr. Dale was not a psychiatrist and would have little knowledge of plaintiff's mental limitations, and plaintiff neither was nor had been in treatment for any alleged mental condition.  As such, the ALJ afforded Dr. Dale's opinions minimal weight.

Furthermore, the ALJ found that plaintiff's own statements regarding his physical and mental limitations were less than credible.  (Tr. 16-17).  Specifically, the ALJ concluded that plaintiff's statements concerning the intensity, persistence and limiting effects of his alleged symptoms were inconsistent with his activities of daily living, the lack of objective medical evidence to support his allegations, and the conservative medical treatment he received for his conditions.

The Social Security regulations provide that "the commissioner will generally give a treating physician's 'opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)' 'controlling weight' when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  Cline v. Colvin, 771 F.3d 1098, 1103 (8th Cir. 2014) (quoting 20 C.F.R. § 416.927(d)(2)).  However, "such weight is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole."  Id. (internal citations and quotations omitted).  The ALJ "may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Id. (quoting Anderson v.

<u>Astrue</u>, 696 F.3d 790, 793 (8th Cir. 2012)).  The ALJ has the task of resolving conflicts in the evidence and issues of credibility.  <u>Hacker v. Barnhart</u>, 459 F.3d 934, 936 (8th Cir. 2006).

Dr. Dale first treated plaintiff in April 9, 2012.  (Tr. 423-25).  Following a second appointment less than a month later on May 2, 2012, Dr. Dale completed disability forms for plaintiff.  (Tr. 392-93, 395-96).  Dr. Dale provided diagnoses that differed and were more extreme than any other treating physician in the record, including "severe COPD" and diabetic neuropathy.  (Tr. 402-03, 412-13, 423-25).  Dr. Dale's findings regarding plaintiff's physical condition were not supported by other objective medical evidence in the record, such as plaintiff's chest x-rays, CT scans, and EKG interpretations.  (Tr. 273, 278, 295, 384, 400, 434).  Dr. Dale's medical notes, furthermore, were brief without detailed explanation, in contrast to other medical reports in the record.  Also, while Dr. Dale provided a mental medical source statement for plaintiff, no evidence in the record shows that Dr. Dale conducted a psychological evaluation or test of plaintiff or relied on plaintiff's treatment or testing from any mental health professional.

Dr. Hughes' opinion, on the other hand, was consistent with plaintiff's pulmonary test results, x-ray reports, CT scans, daily activities, and minimal treatment.  Plaintiff argues that Dr. Hughes' September 22, 2011 opinion cannot be credited because he did not have the opportunity to review later medical evidence added to the record or Dr. Dale's May 2, 2012 opinion.  However, no significant changes in plaintiff's health occurred after Dr. Hughes' assessment.  For example, a chest x-ray on January 4, 2012 found no evidence of acute cardiopulmonary disease.  (Tr. 434).  In contrast to plaintiff's contention, the medical evidence

contributed to the record after September 22, 2011 as a whole is consistent with Dr. Hughes' opinion and supports the ALJ's findings. Accordingly, substantial evidence in the record supports the weight the ALJ afforded to the conflicting opinion evidence and the ALJ's RFC determination.

## VI. <u>Conclusion</u>

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.


_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE


Dated this 7th day of August, 2015.